1  **RA & ASSOCIATES, APC**
ROMEL AMBARCHYAN, ESQ. (SBN 245216)
2  MANUEL MAGPAPIAN, ESQ. (SBN 315180)
505 N. Brand Blvd. Suite 800
3  Glendale, CA 91203
Telephone: (818) 230-3220
4  Facsimile: (818) 230-3211
5

6  Attorneys for Plaintiffs,
Richard Jacobik and Christine Jacobik
7

8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10

11  RICHARD JACOBIK, an individual;      **Case No: 3:17-CV-05121-LB**
CHRISTINE JACOBIK, an
12  individual,                          **PLAINTIFFS' OPPOSITION TO**
                                         **DEFENDANT'S MOTION TO**
13          Plaintiffs,                  **DISMISS FIRST AMENDED**
                                         **COMPLAINT**
14
15              v.
16
17  WELLS FARGO BANK, N.A.; and
DOES 1-100, INCLUSIVE
18
        Defendants.
19
20
21
22
23
24
25
26
27
28

                            1
─────────────────────────────────────────────────
OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

# **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................2

II. SUMMARY OF THE FACTS ..............................................................................2

III. LEGAL ARGUMENTS ......................................................................................4

    A. Standard of Review……………………… ……………….......................4

    B. Plaintiffs Sufficiently Pleaded a Cause of Action for Violation of Cal.
        Civ. Code §2923.6……………………………………………………......5

    C. Plaintiffs Sufficiently Pleaded a Cause of Action for Violation of Cal.
        Civ. Code §2923.7……………………………………………………8

    D. Plaintiffs Sufficiently Pleaded a Cause of Action for Negligence……….10

        1. Wells Owes Duty of Case to Plaintiff…………………………..……10

        2. Negligence Per Se Doctrine………………………………………..12

IV. IF THIS COURT IS INCLINED TO GRANT THE MOTION TO DISMISS,
LEAVE TO AMEND SHOULD BE GRANTED....................................................12

V. CONCLUSION ....................................................................................................13

# TABLE OF AUTHORITIES

**CASES**

*Novarro v. Black*, 250 F.3d 729, 732 (9th Cir. 2001)...............................................4

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ..............................................................5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)........................................5

*Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008). ..........5

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997)............................5

*Hall v. City of Santa Barbara*, 833 F. 2d 1270, 1274 (9th Cir. 1986)........................5

*Foronda v. Wells Fargo*, 2014 WL 6706815, at *6 (N.D. Cal. Nov. 26, 2014)......5

*Copeland v. Ocwen Loan Servicing, LLC*, 2014 WL 304976, at *5 (C.D. Cal. Jan. 3, 2014) ...................................................................................................................5

*Nardolillo v. JPMorgan Chase Bank, N.A., 2017* WL 1493273, at *5 (N.D. Cal. Apr. 26, 2017)....................................................................................................5

*McKinley v. CitiMortgage, Inc.,* 2014 WL 651917, at *4 (E.D. Cal. Feb. 19, 2014) .....................................................................................................................6

*Hestrin v. Citimorgage*, 2015 Wl 847132, at 3 (C.D. Cal. Feb. 25, 2015).........6, 9

*Medrano v. Caliber Home Loans*, 2014 WL 7236925, at *7 (C.D. Cal. Dec. 19, 2014)...................................................................................................................6

*Gonzales v. Citimortgage*, 2014 WL 7927627, at *1 (N.D. Cal. Oct. 10, 2014) .....6

*Valentino v. Select Portfolio Servicing Inc.*, 2015 WL 575385 at *&4 (N.D. Cal. Feb. 10, 2015).....................................................................................................6

*Norris v. Bayview Loan Servicing*, 2016 WL 337381, at *3 (C.D. Cal. Jan. 25, 2016)...................................................................................................................6

*Curtis v. Nationstar Morg. LLC*, 2015 WL 4941554, at *2 (N.D. Cal. Aug. 19, 2015)...................................................................................................................6

*Chambers v. Davis,* 131 Cal. App. 500, 506 (Cal. App. 1933) ...........................7

*Haines v. Department of Employment,* 125 Cal. App. 2d 304, 306 (Cal. App. 1954) ...................................................................................................................7

*County of Alameda v. Kuchel,* 32 Cal. 2d. 193, 198 (Cal. 1948) .......................7

*Traub v. Edwards*, 38 Cal. App. 2d 719, 722 (Cal. App. 1940).........................7

*Green v. Wells Fargo Bank, N.A.*, 2015 WL 2159460 at *3 (N.D. Cal. May 7, 2015) ...................................................................................................................8

*Hendricks v. Wells Fargo Bank, N.A.*, 2015 WL 1644028, at 8-9 (C.D. Cal. Apr. 14, 2015) ...........................................................................................................8

*Rizk v. Residential Credit Solutions, Inc.*, 2015 WL 573944, at 12 (C.D. Cal. Feb. 10, 2015) ...................................................................................................8, 10

*Shapiro v. Sage Point Servs.*, 2014 WL 5419721, at *6 (C.D. Cal. Oct. 24, 2014) ...................................................................................................................8

*Shaw v. Specialized Loan Servicing, LLC*, 2014 WL 3362359, at *7 (C.D. Cal. July 9, 2014)...........................................................................................................8

*Diamos v. Specialized Loan Servicing, LLC*, 2014 WL 3362259, at *4 (N.D. Cal. Feb. 3, 2014)...........................................................................................................9

*Garcia v. PNC. Mortg.*, 2015 WL 534395 at *4-5 (N.D. Cal. App. Feb. 9, 2015) ...................................................................................................................9

*Hixon v. Wells Fargo Bank*, 2014 WL 3870004, at*6 (N.D. Cal. Aug. 6, 2014) ...................................................................................................................9

*Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941, 944 (2014) .............................................................................................................10, 11

*Daniels v. Select Portfolio Servicing, Inc.,* 246 Cal. App. 4th 1150, 1180 (2016) .............................................................................................................10, 11

*Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App. 3d 1089, 1096 (1991) ...................................................................................................................10

*Jolley v. Chase Home Finance, LLC*, 213 Cal. App. 4th 872, 901 (2013).......10, 11

*Biakanja v. Irving*, 49 Cal. 2d 648, 650.................................................................11

*Weber v. PNC Bank, N.A.*, 2015 LEXIS 7041, at \*14-15 (E.D. Cal. Jan. 21, 2015) ...............................................................................................................12

*Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1285..............................12

*Sierra-Bay Fed. Land Bank Assn. v. Superior Court*, 227 Cal. App. 3d 318, 333-334 ...............................................................................................................12

*Mayes v. Leipziger*, 729 F.2d 605, 607-609 (9th Cir. 1984)............................12

*Breier v. Northern California Bowling Proprietors' Assn.*, 316 F.2d 787, 789 (9th Cir. 1963)...........................................................................................12, 13

## STATUTES AND RULES

Cal. Civ. Code §2923.5................................................................................2

Civ. Code § 2923.7 ..............................................................................3, 8, 9

Cal. Civ. Code §2923.6...................................................................4, 5, 6, 7, 8

Fed. R. Civ. P. 8(a)(2)................................................................................5

Cal. Civ. Code section 2924.11........................................................................7

1           **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.**    **INTRODUCTION**

3       Plaintiffs RICHARD JACOBIK and CHRISTINE JACOBIK (collectively

4 referred to as "Plaintiffs") are, and at all times relevant to the facts herein, were the

5 owners of the real property commonly known as 4086 Inniswood Place, CA 94568

6 ("Subject Property").[1] Defendant, Wells Fargo Bank, N.A.'s ("WELLS" and/or

7 "Defendant") instant motion must be denied as Plaintiffs' Complaint states

8 sufficient facts to give Wells fair notice of the claims and the current case law and

9 the newly enacted Homeowner Bill of Rights ("HBOR") supports Plaintiffs'

10 claims. Furthermore, Plaintiffs' HBOR claims are not preempted by the federal law.

      As fully briefed in Plaintiffs' Memorandum, Plaintiffs' Complaint pleads

11 sufficient facts in support of its causes of action and the claims are not preempted

12 by Home Owner's Loan Act ("HOLA"). Therefore, Defendant's Motion should be

13 denied.

14 **II.**    **SUMMARY OF FACTS**

15       On or about March 7, 2007, Plaintiffs obtained a loan in the amount of

16 $631,200.00 ("NOTE") through WELLS as the lender of the NOTE. The NOTE

17 was secured by a Deed of Trust.

18       In 2012, Plaintiffs fell behind in their mortgage payments for a very short

19 period of time.[2]

20       Unbeknownst to Plaintiffs, WELLS caused a Notice of Default to be

21 recorded on or about June 14, 2012 ("NOD"). Despite the self-serving declaration

22 that WELLS contacted Plaintiff as required by Civ. Code §2923.5, Plaintiffs never

23 received any phone calls, had no voicemails, and did not receive a certified letter

24 from WELLS prior to recordation of the NOD and Plaintiff had the same primary

25

26 ─────────────────
[1] Attached hereto as **Exhibit "1"** is the true and authentic copy of Plaintiffs'

27 Verified First Amended Complaint ("FAC"); <u>see</u> FAC ¶1
[2] FAC ¶27

28

1  phone number on their file for years.[3]

2      Plaintiffs were able to make the missed payments and to bring their account

3  current after the NOD was recorded. However, even after Plaintiffs' account

4  became current, WELLS did not rescind the NOD clouding Plaintiffs' title.

5  Unfortunately, due to unforeseen loss of employment and medical expenses,

6  Plaintiffs defaulted on the NOTE in or around 2014. Plaintiffs made the mortgage

7  payments until their savings were depleted and they could no longer continue the

8  payments.[4]

9      In 2017, Plaintiffs experienced significant change in the financial situation

10  and submitted a complete loan modification application to WELLS in or around

11  February 24, 2017 and requested a foreclosure prevention alternative to save their

12  home. Thereafter, Plaintiffs were shuffled from one representative to another every

13  time they called to check on the status of his application. WELLS failed to assign a

14  single point of contact ("SPOC") as required by Civ. Code. §2923.7 capable of

15  performing their responsibilities listed in Civ. Code §2923.7 (b). None of the

16  SPOCs were aware of current status of Plaintiffs' file, kept asking the same

17  information and would inform Plaintiffs that they will review the file and get back

18  to him. Moreover, every time Wells assigned a new representative, the review

19  process was unnecessarily delayed because the new representative had to review the

20  file and would request the same documents, which they claimed either expired or

21  were misplaced.[5]

22      On or around March 15, 2017, less than a month after Plaintiffs submitted a

23  complete loan modification application, WELLS sent a vague and conclusory

24  denial letter and informed Plaintiffs that they allegedly did not qualify for a loan

25  modification based on the results of Plaintiffs' net present value (NPV) evaluation

26  ("Denial Letter").[6]

27  _____

[3] FAC ¶¶28-29
[4] FAC ¶¶30-31
[5] FAC ¶¶33-35
[6] FAC ¶ 37

OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    Plaintiffs believe and thereon allege that WELLS did not have the accurate

2    NPV calculations because WELLS lost the documents Plaintiffs sent them as

3    evident by WELLS repeatedly providing inconsistent information regarding

4    whether certain documents were received even though Plaintiff had already sent

5    them.[7]

6    Upon receiving this conclusory denial, Plaintiffs timely appealed the denial

7    and requested the NPV inputs WELLS used to determine their ineligibility for a

8    loan modification to review the inputs and make sure WELLS used the correct

9    information Plaintiffs provided and the value of the Subject Property WELLS used.

10   WELLS, in direct and material violation of Civ. Code §2923.6 (f) (3), did not

11   provide Plaintiffs with the NPV inputs. Instead, WELLS sent another vague and

12   non-responsive correspondence to Plaintiffs advising Plaintiffs that upon review of

13   their decision, WELLS determined that Plaintiffs "still do not meet the

14   requirements for a loan modification." To date, Plaintiffs have not received the

15   NVP inputs and are informed and believe and thereon allege that WELLS failed to

16   properly review their loan modification application, including their gross income

17   and did not have the correct property value.[8]

18   WELLS' negligent review of the loan modification application and failure to

19   provide the NPV inputs Plaintiffs were entitled to receive is a direct and material

20   violation of HBOR statutes. Despite these material violations, Wells continues with

21   the foreclosure process.

## III.   LEGAL ARGUMENTS

### A. Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint." *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir. 2001). "A claim may be dismissed only if 'it appears beyond doubt that plaintiff can prove no set of facts in

---

[7] FAC ¶ 38
[8] FAC ¶¶39-41

OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

1   support of his claim which would entitle him to relief.'" *Id.* (*internal citations*
2   *omitted*).

3       Under the Federal Rules of Civil Procedure, Plaintiffs are required only to
4   plead "a short and plain statement of the claim showing that the pleader is entitled to
5   relief." Fed. R. Civ. P. 8(a)(2). "Specific facts are not necessary; the statement need
6   only give the defendant's fair notice of what... the claim is and the grounds upon
7   which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The complaint need to
8   state only enough facts to state a claim for relief that is plausible on its face. *Bell*
9   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept all
10  factual allegations of the complaint as true and draw all reasonable inferences "in the
11  light most favorable to [the Plaintiffs]," when considering Defendants' motions to
12  dismiss. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008).

13      "The Rule 8 standard contains 'a powerful presumption against rejecting
14  pleadings for failure to state a claim.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246,
15  249 (9th Cir. 1997) (citation omitted). Motions to dismiss for failure to state a claim
16  are viewed with disfavor and are rarely granted. *Hall v. City of Santa Barbara*, 833
17  F. 2d 1270, 1274 (9th Cir. 1986).

18      **B. Plaintiffs Sufficiently Pleaded a Cause of Action for Violation of Cal.**
19      **Civ. Code § 2923.6**

20      Civ. Code. §2923.6 (c) prohibits servicers from "recording" an NOD or NTS,
21  or "conducting" a foreclosure sale if the borrower submitted a complete loan
22  modification application.

23      Scheduling and refusing to postpone a sale is "conducting" a sale and
24  prohibited by the statute. **See** *Foronda v. Wells Fargo*, 2014 WL 6706815, at *6
25  (N.D. Cal. Nov. 26, 2014); **see also** *Copeland v. Ocwen Loan Servicing, LLC*, 2014
26  WL 304976, at *5 (C.D. Cal. Jan. 3, 2014) (finding that the serving of notice of sale
27  on borrowers to violate Civ. Coder §2923.6); **see also** *Nardolillo v. JPMorgan*
28  *Chase Bank, N.A., 2017* WL 1493273, at *5 (N.D. Cal. Apr. 26, 2017) (allegations

5

1  that the servicer reset trustee sale dates after initial NTS was recorded and informed

2  borrower of the new sale date while a loan modification application was under

3  review were sufficient).

4      An application may be complete even if the servicer later requests additional

5  documentation. **See** *McKinley v. CitiMortgage, Inc.,* 2014 WL 651917, at *4 (E.D.

6  Cal. Feb. 19, 2014) (holding the fact that servicer "may hypothetically request

7  additional information in the future does not render implausible the claim that the

8  loan modification application was complete"). Furthermore, courts refused to

9  determine the issue of "completeness" of the application at the pleading stages of

10  litigation. *Hestrin v. Citimorgage,* 2015 Wl 847132, at 3 (C.D. Cal. Feb. 25, 2015);

11  **see also** *Medrano v. Caliber Home Loans,* 2014 WL 7236925, at *7 (C.D. Cal.

12  Dec. 19, 2014); *Gonzales v. Citimortgage,* 2014 WL 7927627, at *1 (N.D. Cal. Oct.

10, 2014).

13      Subsection (g) of Civ. Code §2923.6 allows a borrower to submit a

14  subsequent loan modification if there has been a material change in the borrower's

15  financial circumstances since the borrower's previous application. A decline in

16  income can constitute a material change in financial circumstances. *Valentino v.*

17  *Select Portfolio Servicing Inc.,* 2015 WL 575385 at *&4 (N.D. Cal. Feb. 10, 2015)

18  (finding "no basis to conclude that a reduction in income cannot satisfy the

19  "material change" requirement of section 2923.6 (g)). Courts have also extended

20  dual tracking protections to borrowers who can show that their servicer agreed to

21  review a subsequent modification. *Norris v. Bayview Loan Servicing,* 2016 WL

22  337381, at *3 (C.D. Cal. Jan. 25, 2016); **see also** *Curtis v. Nationstar Morg.* LLC,

23  2015 WL 4941554, at *2 (N.D. Cal. Aug. 19, 2015) ("If the servicer voluntarily

24  undertakes to review a loan modification application, a borrower may avail him or

25  herself of the protections afforded under Cal. Civ. Code § 2923.6.").

26      The Defendant argues in their Motion to Dismiss that since Cal. Civ. Code

27  §2923.6 was repealed as of January 1, 2018, this cause of action should be

28  dismissed. However, California courts have long held that when a statute is

6

1   repealed without a savings clause and as part of the same act it simultaneously re-

2   enacts a statute in substantially the same form and substance, all the rights and

3   liabilities which accrued under the former act will be preserved and enforced.

4   *Chambers v. Davis,* 131 Cal. App. 500, 506 (Cal. App. 1933), *Haines v.*

5   *Department of Employment,* 125 Cal. App. 2d 304, 306 (Cal. App. 1954). In

6   addition, it is held that an express saving clause is not necessary in order to save

7   rights under a repealed statute, it is sufficient if an intent to that effect appears by

8   legislative provision at the session of Legislature effecting the repeal of the statute

9   from which the rights are to be saved. *County of Alameda v. Kuchel,* 32 Cal. 2d.

10  193, 198 (Cal. 1948). Finally, California courts have also held that an express

11  saving clause in a repealing statute is not required in order to prevent the

12  destruction of rights existing under statute, if the intention to preserve such rights is

13  otherwise clearly apparent such as whether "it can be apparent from any act on the

14  same subject passed by the legislature at the same session that it was the legislative

15  intent that pending proceedings should be saved, it will be sufficient to effect that

16  purpose." *Traub v. Edwards*, 38 Cal. App. 2d 719, 722 (Cal. App. 1940).

17      Here, Cal. Civ. Code section 2923.6 went into effect January 1, 2013 and by

18  its own terms is repealed as of January 1, 2018. However, the California legislature

19  also passed Cal. Civ. Code section 2924.11B which also went into effect on the

20  same day. This statute states that it is operative January 1, 2018. This statute states

21  that "if a borrower submits a complete application for a foreclosure prevention

22  alternative offered by, or through, the borrower's mortgage servicer…shall not

23  record a notice of sale or conduct a trustee's sale while the complete foreclosure

24  prevention alternative is pending…." Further, this same statute indicates that

25  following a denial of a first lien loan modification application, the mortgage

26  servicer shall send a written notice to the borrower identifying with specificity the

27  reasons for the denial and shall include a statement that the borrower may obtain

28  additional documentation supporting the denial decision…." Ultimately, these

    statutes went into effect on the same date. In addition, even with Cal. Civ. Code

7

1    section 2923.6's repeal, the fact that the legislature enacted these statutes together

2    indicate that the California legislature did not intend for borrowers to not have any

3    causes of actions for mortgage servicer's wrongdoings. Thus, dismissing Cal. Civ.

4    Code section 2923.6 as a result of a repeal would be contrary to the legislative

5    intent and contrary to court precedent.

6         In addition, it would be inequitable to allow WELLS to avoid not providing

7    specific NPV values just because the statute was repealed as of January 1, 2018.

8    Ultimately these causes of actions accrued prior to January 1, 2018, dismissing this

9    cause of action even though it accrued prior to the repeal date would allow WELLS

10   and other mortgage servicers to avoid liabilities as a result of wrongdoings that

11   HBOR was designed to prevent. Therefore, the court should deny this motion to

     dismiss as a result.

12        **C. Plaintiffs Sufficiently Pleaded a Cause of Action for Violation of Cal.**

13             **Civ. Code § 2923.7**

14        Civ. Code §2923.7 requires that a mortgage servicer appoints a single point

15   of contact when a borrower requests a foreclosure prevention alternative and

16   requires that a single point of contact is knowledgeable about the borrower's

17   situation and the current status.

18        California courts have found that every violation that undermines the purpose

19   of the HBOR is a material violation. *Green v. Wells Fargo Bank, N.A.*, 2015 WL

20   2159460 at *3 (N.D. Cal. May 7, 2015); *Hendricks v. Wells Fargo Bank, N.A.*,

21   2015 WL 1644028, at 8-9 (C.D. Cal. Apr. 14, 2015); *Rizk v. Residential Credit*

22   *Solutions, Inc.*, 2015 WL 573944, at 12 (C.D. Cal. Feb. 10, 2015). The SPOC

23   provision was intended to reduce borrower's frustrations as they attempt to contact

24   their servicers to gain useful information about the loan modification status.

25   Moreover, to fulfill SPOC duties and comply with HBOR's dual tracking rules, a

26   SPOC capable of performing his responsibilities under 2923.7 (b) must be

27   necessary appointed. *Shapiro v. Sage Point Servs.*, 2014 WL 5419721, at *6 (C.D.

28   Cal. Oct. 24, 2014); **see also** *Shaw v. Specialized Loan Servicing, LLC*, 2014 WL

8

1  3362359, at *7 (C.D. Cal. July 9, 2014) (granting a permanent injunction based on

2  borrower's allegations that he was shuffled from SPOC to SPOC and none of them

3  could provide him with the status of his loan modification application (emphasis

4  added); see also *Diamos v. Specialized Loan Servicing, LLC*, 2014 WL 3362259, at

5  *4 (N.D. Cal. Feb. 3, 2014) (finding that borrower pled viable SPOC claim where

6  none of the servicer representatives had the knowledge or authority to perform

7  SPOC duties) (complaint dismissed on jurisdiction grounds). Some courts have

8  concluded that **materiality is a factual question** that should not be resolved at the

9  pleadings stage. *Hestrin v. Citimortgage, Inc.*, 2015 WL 847132, at *3 (C.D. Cal.

   Feb. 25, 2015); *Garcia v. PNC. Mortg.*, 2015 WL 534395 at *4-5 (N.D. Cal. App.
10
   Feb. 9, 2015); *Hixon v. Wells Fargo Bank*, 2014 WL 3870004, at*6 (N.D. Cal.
11
   Aug. 6, 2014).
12
        Defendant alleges in their motion to dismiss that Plaintiffs admit that their
13
   application was reviewed to completion and a decision was made and that therefore,
14
   Plaintiffs have not alleged how a denial of a SPOC had any effect upon their
15
   outcome of their loan modification application. However, Plaintiffs have already
16
   alleged that Plaintiffs had to deal with multiple SPOCs each of whom requested the
17
   same documents over and over again, unable to adequately inform Plaintiffs as to
18
   the status of their loan modification application. In addition, it has also been alleged
19
   that because the SPOCs requested the same documents over and over again and
20
   were unable to inform Plaintiffs of the status of their case, WELLS did not
21
   accurately and properly review Plaintiffs' LMA as evidenced by the fact that
22
   WELLS failed to use accurate NPV information. Plaintiffs have further alleged that
23
   because WELLS representatives asked for the same information and the same
24
   documents the process was unnecessarily delayed which caused confusion as to the
25
   current status of Plaintiffs' LMA.
26
        There has been sufficient facts alleged as to a violation of Cal. Civ. Code
27
   2923.7 and therefore, Defendant's Motion to Dismiss should be denied. Moreover,
28
   Wells recorded the NOD, NTS and continues with the foreclosure process.  The

court in *Rizk* determined that failure to comply with the straightforward language of the statute is a material violation and noted that "the [NOD and NTS] are the very essence of the statute and failure to abide by the straightforward language of the statute is a material violation." *Rizk*, 2015 WL 573944, at 12 (C.D. Cal. Feb. 10, 2015).

### D. Plaintiffs Sufficiently Pleaded a Cause of Action for Negligence

To sate a cause of action for negligence, a plaintiff must allege "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately cased the plaintiff's damages or injuries." *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941, 944 (2014); **see also** *Daniels v. Select Portfolio Servicing, Inc.,* 246 Cal. App. 4th 1150, 1180 (2016).

#### 1. *Wells Owes Duty of Care to Plaintiff*

Wells' reliance on *Nymark v. Heart Fed. Savings & Loan Assn.* and other cases regarding the duty of care is misplaced for the following reasons. *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App. 3d 1089, 1096 (1991). "'*Nymark* does not support the sweeping conclusion that a lender never owes a duty of care to a borrower." *Jolley v. Chase Home Finance, LLC*, 213 Cal. App. 4th 872, 901.

**First**, most of the cases *Nymark* cited for the general rule that a financial institution owes no duty of care to a borrower when its involvement in the loan transaction does not exceed the scope of the conventional role of a mere lender of money involved "actions by third parties against construction lenders." *Daniels*, 246 Cal. App. 4th 1150, 1180.The Court in *Daniels* refused to follow the line of cases holding that the "general rule" articulated in *Nymark* bars negligence actions by borrowers finding that "the 'general rule' was developed in the context of actions by third parties seeking to hold construction lenders liable for borrowers' failings (e.g., construction defects)" because it would not make sense to impose such duty unless a construction lender, similar to a conventional lender, was actively involved in the borrower's construction project. *Daniels*, 246 Cal. App. 4th 1150, 1181.

OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

**Second**, the courts have "concluded that a lender may owe a duty of care to a borrower based on the *Biakanja* factors, despite the fact that the lender was acting as a conventional lender. *Daniels*, 246 Cal. App. 4th 1150, 1181, **citing** *Jolley v. Chase Home Finance, LLC*, 213 Cal. App. 4th 872, 901 (2013) and *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941, 945 (2014). In *Biakanja v. Irving*, the California Supreme Court held that whether the defendant in a specific case "will be held liable to a third party not in privity is a matter of policy and involves the balancing of various factors, including (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. *Biakanja v. Irving*, 49 Cal. 2d 648, 650; see also *Daniels*, 246 Cal. App. 4th 1150, 1181 (**citing** *Biakanja*). The application of *Biakanja* factors will lead this Court to determine that Wells owes a duty of care under the circumstances of this case.

Defendant argues that even if WELLS owed Plaintiffs a duty of care, Plaintiffs have not alleged sufficient facts which indicate that WELLS violated that duty. It has been specifically alleged in the FAC that WELLS failed to provide a good faith review of Plaintiffs' LMA, failed to assign a SPOC capable of conducting its responsibilities according to state statutes, failed to provide NPV inputs when the Plaintiff requested it, failed to properly review the appeal of the denial, failed to rescind the NOD when Plaintiffs paid the amounts in default, and continued with foreclosure proceedings even though Plaintiffs had violated statutes in doing so.

In addition, Plaintiffs have alleged that as a result of all of these conducts, and as a result of WELLS representatives' not having up to date information regarding the Plaintiffs' files, as evidenced by WELLS providing inconsistent information regarding Plaintiffs' file, WELLS did not properly review Plaintiffs for

11

a loan modification with accurate NPV calculations. Further, WELLS not providing Plaintiffs with the requested information meant that Plaintiffs were unable to understand why their LMA was denied and whether such an application was conducted in good faith.

There has been sufficient facts to demonstrate that WELLS owed a duty to the Plaintiffs, breached that duty which caused damages as a result. Therefore, WELLS' motion to dismiss should be denied.

### 2. *Negligence Per Se Doctrine*

Under the doctrine of negligence per se, which is a vehicle for proving negligence, a presumption of negligence arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm the plaintiff suffered as a result of violation. *Weber v. PNC Bank, N.A.*, 2015 LEXIS 7041, at *14-15 (E.D. Cal. Jan. 21, 2015) (**citing** *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1285; *Sierra-Bay Fed. Land Bank Assn. v. Superior Court*, 227 Cal. App. 3d 318, 333-334).

Plaintiffs' Complaint alleges that as a direct and proximate result of Wells' actions and omissions, Plaintiff suffered damages.[9]

## IV.   **IF THIS COURT IS INCLINED TO GRANT THE MOTION TO DISMISS, LEAVE TO AMEND SHOULD BE GRANTED**

If the court perceives any defect in the Plaintiff's Complaint, it should grant the Plaintiff leave to amend. The Ninth Circuit determined that a party must be given at least an opportunity to amend the complaint after a motion to dismiss is granted. *Mayes v. Leipziger*, 729 F.2d 605, 607-609 (9th Cir. 1984). The Ninth Circuit based its holding in part on Federal Rule of Civil Procedure 15(a) which provides that "a party may amend his pleadings once as a matter of course at any time before a responsive pleading is filed. *Id.* at 60. A motion to dismiss is not considered a "responsive pleading." *Breier v. Northern California Bowling*

---

[9] FAC ¶¶75, 80

1   *Proprietors' Assn.*, 316 F.2d 787, 789 (9th Cir. 1963). Granting a motion to dismiss

2   does not terminate the right to amend. *Id.*

3   **V.**    **CONCLUSION**

4       For the reasons stated above, Plaintiff respectfully asks this Court to deny

5   Wells' Motion.

6

7    Dated: January 25, 2018             **RA & ASSOCIATES, APC**

8                         By: */s/ Manuel Magpapian*

9                            MANUEL MAGPAPIAN

10                          ROMEL AMBARCHYAN

11                          Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

# EXHIBIT "1"

**RA & ASSOCIATES, APC**
ROMEL AMBARCHYAN, ESQ. (SBN 245216)
MANUEL MAGPAPIAN, ESQ. (SBN 315180)
505 N. Brand Blvd. Suite 800
Glendale, CA 91203
Telephone: (818) 230-3220
Facsimile: (818) 230-3211

Attorneys for Plaintiffs,
Richard Jacobik and Christine Jacobik

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD JACOBIK, an individual;
CHRISTINE JACOBIK, an
individual,

     Plaintiffs,

     v.

WELLS FARGO BANK, N.A.; and
DOES 1-100, INCLUSIVE

     Defendants.

**Case No: 3:17-CV-05121-LB**

**VERIFIED FIRST AMENDED COMPLAINT FOR:**

**1) CIVIL CODE SECTION 2923.6**
**2) CIVIL CODE SECTION 2923.7**
**3) NEGLIGENCE**
**4) UNFAIR BUSINESS PRACTICES**
**5) CIVIL CODE SECTION 2923.5**

     **COME NOW** the Plaintiffs RICHARD JACOBIK and CHRISTINE JACOBIK (collectively referred to as "Plaintiffs"), who hereby demand a speedy jury trial on all causes of actions stated herein, and hereby alleges as their Verified Complaint against WELLS FARGO BANK, N.A ("WELLS") herein as follows:

//

//

## PARTIES

1. Plaintiffs RICHARD JACOBIK and CHRISTINE JACOBIK (collectively referred to as "Plaintiffs") are, and at all times relevant to the facts herein, were the owners of the real property commonly known as 4086 Inniswood Place, Dublin, CA 94568 ("Subject Property") located in the County of Alameda, in the State of California. At all times, relevant to the facts herein, the Subject Property was and is an owner-occupied residence.

2. Plaintiffs are informed and believes and thereon allege that Defendant, WELLS FARGO BANK, N.A ("WELLS" and/or "Defendant") is a national bank with its principal place of business in San Francisco, California with its agent for service of process as CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC-LAWYERS INCORPORATING SERVICE located at 2710 Gateway Oaks Drive, Suite 150n, Sacramento, CA 95833.

3. The true names and capacities, whether individual, corporate, partnership, associate, or otherwise of Defendants DOES 1 through 100, are unknown to Plaintiffs who sue each Defendant by such fictitious names.  Plaintiffs are informed and believe and, thereon, allege each of the Defendants designated herein as a fictitiously named Defendant is, and in some manner, was responsible for the events and happenings referred to herein, either contractually or tortuously. When Plaintiff ascertains the true names and capacities of DOES 1 through 20, they will amend this Complaint accordingly.

4. Plaintiffs are informed and believe and based thereon alleges that Defendants and each of them, are, and at all times herein mentioned were, the agents, joint venturers, officers, members, representatives, servants, consultants or employees of their co-defendants, and in committing the acts herein alleged, were acting within the scope of such affiliation with the knowledge, permission, consent or subsequent ratification of their co-defendants.

//

2

First Amended Complaint

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this matter as the Subject Property is located in the County of Alameda, California.

6.     In addition, this Court has subject matter jurisdiction over the claims raised herein pursuant to *California Constitution* Article VI, section 10, which grants this Court "original jurisdiction in all causes except those given by statute to other trial courts."

7.     Defendants herein purposefully directed their activities to the State of California.   As a result, Defendants caused an event or events to occur in California, and more particularly in the County of Alameda, out of which this action arises and which form the basis of this action.

8.     Defendants either are entities duly licensed to do business in the State of California or are entities that regularly conduct business within this judicial district within California.

9.     Venue is proper for this Court since the Subject Property (described below) is located in the County of Alameda and because the events, or events out of which this action arises and which form the basis for this action, arise in the County of Alameda.

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS
## 2017 DEUTSCHE BANK SETTLEMENT AGREEMENT

10.     On January 17, 2017, the Justice Department, along with federal partners, announced a $7.2 billion settlement with Deutsche Bank resolving civil claims that Deutsche Bank misled investors in the packaging, securitization, marketing, sale and issuance of residential mortgage-backed securities ("RBMS") between 2006 and 2007. This $7.2 billion agreement represents the single largest RMBS resolution for the conduct of a single entity. The settlement requires Deutsche Bank to pay a $3.1 billion civil penalty under the Financial Institution Reform, Recovery and Enforcement Act ("FIRREA"). **Under the settlement,**

3

1   Deutsche Bank will also provide $4.1 billion in relief to underwater

2   homeowners, distressed borrowers and affected communities.

3   **WELLS FARGO AND OCC CONSENT DECREE AND THE NATIONAL**

4   **MORTGAGE SETTLEMENT**

5       11.   Wells Fargo is a direct signatory to the OCC Consent Decree and the

6   National Mortgage Settlement. The Consent Decree and the Settlement were

7   regulatory and judicial actions designed to address various abuses in the

8   Foreclosure activities and lenders and servicers have engaged in. These abuses

9   include:

10          a.  failing to timely and accurately apply payments made by borrowers
            and

11          b.  failing to maintain accurate account statements;

12          c.  providing false or misleading information in response to borrower
            complaints;

13          d.  failing to provide accurate and timely information to borrowers who
            seek information about loss mitigation services, including loan
            modifications;

14          e.  falsely advising borrowers that they must be at least 60 days
            delinquent in loan payments to qualify for a loan modification;

15          f.  misrepresenting to borrowers that loss mitigation programs would
            provide relief from the initiation of foreclosure or further foreclosure
            efforts;

16          g.  providing false or misleading information to consumers about the
            status of the loss mitigation review, including while referring loans to
            foreclosure;

17          h.  providing false or misleading information to consumers about the
            status of foreclosure proceedings where the borrower was in good-faith
            actively pursuing a loss mitigation alternative offered by the Servicers;

4

First Amended Complaint

i.  failing to properly calculate borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;

j.  failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and as a result, denying loan modifications to consumers who were eligible;

k.  providing false or misleading reasons for denial of loan modifications;

l.  preparing, executing, notarizing, and presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments); and

m. preparing, executing, notarizing, and filing affidavits in foreclosure proceedings, whose affiants lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning."

**HOME AFFORDABLE MODIFICATION PROGRAM (HAMP)**

12.    On February 18, 2009, pursuant to their authority under the Emergency Economic Stabilization Act of 2008, the U.S. Treasury Secretary and the Director of the Federal Housing Finance Agency announced the MAKING HOME AFFORDABLE (MHA) program.  The MAKING HOME AFFORDABLE program consists of two subprograms.  The first program is referred to as HOME AFFORDABLE REFINANCE PROGRAM, or HARP.  The second program is

5

1    referred to as HOME AFFORDABLE MODIFICATION PROGRAM (Hereinafter
2    HAMP). The latter is the program at issue in this case.

3        13.    HAMP is funded by the Federal Government, primarily with Troubled
4    Asset
5    Relief Program (TARP) funds.  The U.S. Treasury Department has allocated at least
6    $75 billion to HAMP, of which at least $50 billion in TARP money.   Because
7    mortgage lenders accepted federal funds additional loan guarantees, it was required
8    to participate in HAMP for any loans on which it functions as a loan "servicer."
9    Mortgage lenders acted as Loan Servicer for the subject loan of Plaintiffs.   In
10   addition,   mortgage   lenders   signed   an   AMENDED   AND   RESTATED
11   COMMITMENT  TO  PURCHASE  FINANCIAL  INSTRUMENTS  AND
12   SERVICER PARTICIPATE AGREEMENT, agreeing to participate in the HOME
13   AFFORDABLE MODIFICATION PROGRAM (HAMP), including all its directives
     and guidelines.

14              **THE SERVICE PARTICIPATION AGREEMENT (SPA)**
15       14.    The SERVICER PARTICIPATION AGREEMENT (SPA) mandates
16   that a Participating Servicer "shall perform" the activities described in the Program
17   Documentation "for all mortgage loans it services," SPA Section 2(A), page 3.

18       15.    The Program Documentation requires Participating Servicers to: (1)
19   evaluate all loans which are 60, or more, days delinquent or appear to be in imminent
20   default (as defined by the Program Documentation) and; (2) determine which loans
21   meet the HAMP eligibility criteria.  In addition, the participating servicers, such as
22   mortgage lenders, must collect income and hardship information to determine if the
23   borrower is eligible for a HAMP loan modification.  A HAMP Modification consists
24   of two stages.  First, a Participating Servicer is required to gather information and, if
25   appropriate, offer the homeowner a Trial Period Plan (TTP).   Second, upon
26   successful completion, the Servicer must offer the homeowner a permanent
27   modification.

28       16.    Because   OCWEN   signed   a   SERVICER   PARTICPATION

                                     6

AGREEMENT (SPA) with the U.S. Treasury Department to provide HAMP loan modifications in return for receiving Troubled Asset Relief Program (TARP) funds to benefit homeowners, mortgage lenders are required by law to comply with the requirements of the SPA.

17.     Ever since, the national press has been reporting stories of numerous illegalities in the policies, practices and procedures of mortgage lenders and other lenders/servicers.  The evidence is overwhelming that mortgage lenders and other lenders/services have been acting outside of the law since the crisis began.  This action is a prime example of mortgage lenders and its agents' wrongful and illegal conduct in their greed for property and fees at any costs without any regard for the rights of homeowners and borrowers.

## MARCH 2012 BANK SETTLEMENT

18.     In March 2012, the government shed light on the wrongful and illegal conduct of

mortgage lenders and other major servicers with a landmark of $25 billion settlement with the five largest U.S. mortgage lenders.

19.     According the eight-count government complaint, the nation's five largest banks,

"engaged in a pattern of unfair and deceptive practices" in servicing mortgages, handling loan modifications and originating loans.  The complaint went on to state that the banks' foreclosure filing contained "false and misleading documents" including affidavits that were filed without being verified, a practice that came to be known as "robosigning".

20.     Pursuant to the settlement, the banks will have to pay $5 billion cash to state and federal governments and provide $20 billion in financial relief to mortgage customers, in the form of interest rate reductions and principle balance reductions.

## JULY 2012 – HOMEOWNER'S BILL OF RIGHTS

21.     Furthermore, as recent as July 11, 2012, Attorney General Kamala D. Harris announced that the Homeowner Bill of Rights, which will protect homeowners

First Amended Complaint

1   and borrowers during the mortgage and foreclosure process, was signed into law by

2   Governor Edmund G. Brown Jr. The Homeowner Bill of Rights prohibits a series of

3   inherently unfair bank practices that have needlessly forced thousands of

4   Californians, including Plaintiffs, into defaulting on their mortgages.   The law

5   restricts dual-tract foreclosures, where a lender forecloses on a borrower despite

6   being in discussions over a loan modification to save the home.  It also guarantees

7   struggling homeowners a single point of contact at their lender with knowledge of

8   their loan and direct access to decision makers, and imposes civil penalties on

9   fraudulently signed mortgage documents. In addition, homeowners may require loan

10   servicers to document their right to foreclose.

       22.    The Homeowner Bill of Rights builds upon and extends reforms first

11   negotiated in the recent national mortgage settlement between forty-nine (49) states

12   and the leading lenders.  Attorney General Harris secured up to $18 billion for

13   California homeowners in that agreement, and has also built a Mortgage Fraud

14   Strike Force to investigate crime and fraud associated with mortgages and

15   foreclosures.  The Homeowners Bill of Rights consists of a series of related bills

16   including two identical bills that were passed on July 2, 2012 by the state Senate

17   and Assembly: AB 278 (Eng, Feuer, Perez, Mitchell) and SB 900 (Leno, Evans,

18   Corbett, DeSaulnier, Pavley, Steinberg.

19             **FACTUAL BACKGROUND ALLEGATIONS**

20       23.    Plaintiffs re-allege and incorporate by reference herein, each and every

21   allegation in the foregoing and successive paragraphs.

22       24.    On or about March 7, 2007, Plaintiffs obtained a loan in the amount of

23   $631,200.00 ("NOTE") through WELLS as the lender of the NOTE. The NOTE

24   was secured by a Deed of Trust. A true and correct copy of the Deed of Trust,

25   recorded in Alameda County Recorder's Office on March 16, 2007, is attached

26   hereto as **Exhibit "A"**.

27       25.    The Subject Property has been and continues to be Plaintiffs' primary

28   residence.

1    26.    WELLS purports to be the servicer of the NOTE.

2    27.    In 2012, Plaintiffs fell behind in their mortgage payments for a very

3    short period of time.

4    28.    Unbeknownst to Plaintiffs, WELLS caused a Notice of Default to be

5    recorded on or about June 14, 2012 ("NOD"). A true and correct copy of the Notice

6    of Default recorded in Alameda County Recorder's Office on June 14, 2012 is

7    attached hereto as **Exhibit "B".**

8    29.    Despite the self-serving declaration that WELLS contacted Plaintiff as

9    required by Civ. Code §2923.5, Plaintiffs never received any phone calls and had

10   no voicemails from WELLS prior to recordation of the NOD and Plaintiff had the

     same primary phone number on their file for years.

11

12   30.    Plaintiffs were able to make the missed payments and to bring their

     account current after the NOD was recorded. However, even after Plaintiffs'

13   account became current, WELLS did not rescind the NOD clouding Plaintiffs' title.

14   31.    Unfortunately, due to unforeseen loss of employment and medical

15   expenses, Plaintiffs defaulted on the NOTE in or around 2014. Plaintiffs made the

16   mortgage payments until their savings were depleted and they could no longer

17   continue the payments.

18   32.    On or about October 4, 2016, WELLS caused a Notice of Trustee's

19   Sale to be recorded ("NOS"). A true and correct copy of the Notice of Trustee's

20   Sale recorded in Alameda County Recorder's Office on October 4, 2016 is attached

21   hereto as **Exhibit "C".**

22   33.    In 2017, Plaintiffs experienced significant change in the financial

23   situation and submitted a complete loan modification application to WELLS in or

24   around February 24, 2017 and requested a foreclosure prevention alternative to save

25   their home.

26   34.    Thereafter, Plaintiffs were shuffled from one representative to another

27   every time they called to check on the status of his application. WELLS failed to

     assign a single point of contact ("SPOC") as required by Civ. Code. §2923.7

28

9

1    capable of performing their responsibilities listed in Civ. Code §2923.7 (b).

2        35.    None of the SPOCs were aware of current status of Plaintiffs' file, kept

3    asking the same information and would inform Plaintiffs that they will review the

4    file and get back to him.

5        36.    Plaintiffs believe and thereon allege that because the SPOCs were not

6    aware of the status of Plaintiffs' loan modification application, and that the SPOCs

7    provided inconsistent information regarding whether documents were received,

8    WELLS did not properly review Plaintiffs' LMA.

9        37.    On or around March 15, 2017, less than a month after Plaintiffs

10   submitted a complete loan modification application, WELLS sent a vague and

11   conclusory denial letter and informed Plaintiffs that they allegedly did not qualify

12   for a loan modification based on the results of Plaintiffs' net present value (NPV)

13   evaluation ("Denial Letter"). A true and correct copy of the March 15, 2017

     correspondence is attached hereto as **Exhibit "D"**.

14       38.    Plaintiffs believe and thereon allege that WELLS did not have the

15   accurate NPV calculations because WELLS lost the documents Plaintiffs sent them

16   as evident by WELLS repeatedly providing inconsistent information regarding

17   whether certain documents were received even though Plaintiff had already sent

18   them.

19       39.    Upon receiving this conclusory denial, Plaintiffs timely appealed the

20   denial and requested the NPV inputs WELLS used to determine their ineligibility

21   for a loan modification to review the inputs and make sure WELLS used the correct

22   information Plaintiffs provided and the value of the Subject Property WELLS used.

23       40.    WELLS, in direct and material violation of Civ. Code §2923.6 (f) (3),

24   did not provide Plaintiffs with the NPV inputs. Instead, WELLS sent another vague

25   and non-responsive correspondence to Plaintiffs advising Plaintiffs that upon

26   review of their decision, WELLS determined that Plaintiffs "still do not meet the

27   requirements for a loan modification." A true and authentic copy of the April 20,

28   2017 correspondence is attached hereto as **Exhibit "E"**.

41.    To date, Plaintiffs have not received the NPV inputs and are informed and believe and thereon allege that WELLS failed to properly review their loan modification application, including their gross income and did not have the correct property value. WELLS' negligent review of the loan modification application and failure to provide the NPV inputs Plaintiffs were entitled to receive is a direct and material violation of HBOR statutes.

42.    Because of this incompetent conduct by Wells and failure to timely process the LMA, the review process was negligently conducted.

43.    As a result of having to deal with multiple SPOCs who could not accurately and adequately perform their responsibilities under Cal. Civ. Code §2923.7 (b), Plaintiff is informed and believes and thereon alleges that WELLS negligently reviewed them for the loan modification.

44.    Despite the fact that Plaintiffs never received the NPV inputs they requested in writing, WELLS continues with the foreclosure proceedings in direct violation of Cal. Civ. Code §2923.7 and 2923.6.

45.    Plaintiffs' property is scheduled for a foreclosure sale on September 19, 2017.

### FIRST CAUSE OF ACTION
### (VIOLATION OF CAL. *CIVIL CODE* SECTION 2923.6)
### (Against all Defendants & DOES 1-100, inclusive)

46.    Plaintiffs re-allege and incorporate by reference herein, each and every allegation in the foregoing and successive paragraphs.

47.    Pursuant to California Civil Code §2923.6, the mortgage servicer, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale or *conduct a trustee's sale until any of the following occurs* (emphasis added):

    (e)(2) "If the borrower appeals the denial pursuant to subdivision (d), the later of 15 days after the denial of the appeal or 14 days after a first lien loan modification is offered after appeal but declined by the borrower..."

11

1   Subsection (f) (3) of Civ. Code 2923.6 provides that borrowers are entitled to

2   NPV inputs if the denial of loan modification is based on NPV values.

3       48.     Due to unforeseen loss of employment and medical expenses,

4   Plaintiffs defaulted on the NOTE in or around 2014. Plaintiffs made the mortgage

5   payments until their savings were depleted and they could no longer continue the

6   payments.

7       49.     On or around March 15, 2017, less than a month after Plaintiffs

8   submitted a complete loan modification application, WELLS sent a vague and

9   conclusory denial letter and informs Plaintiffs that they allegedly did not qualify for

10  a loan modification based on the results of Plaintiffs' net present value (NPV)

11  evaluation. **See Exhibit "D".**

12      50.     Upon receiving this conclusory denial, Plaintiffs timely appeal the

13  denial and requested the NPV inputs WELLS used to determine their ineligibility

14  for a loan modification to review the inputs and make sure WELLS used the correct

15  information Plaintiffs provided and the value of the Subject Property WELLS used.

16      51.     WELLS, in direct and material violation of Civ. Code §2923.6 (f) (3)

17  did not provide Plaintiffs with the NPV inputs. Instead, WELLS sent another vague

18  and non-responsive correspondence to Plaintiffs advising Plaintiffs that upon

19  review of their decision, WELLS determined that Plaintiffs "still do not meet the

20  requirements for a loan modification." **See Exhibit "E".**

21      52.     To date, Plaintiffs have not received the NPV inputs and are informed

22  and believe and thereon allege that WELLS failed to properly review their loan

23  modification application, including their gross income and did not have the correct

24  property value. WELLS' negligent review of the loan modification application and

25  failure to provide the NPV inputs Plaintiffs were entitled to receive is a direct and

26  material violation of HBOR statutes.

27      53.     Despite the fact that Plaintiffs never received the NPV inputs they

28  requested in writing, WELLS continues with the foreclosure proceedings in direct

    violation of Cal. Civ. Code § 2923.6.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CAUSE OF ACTION

## (VIOLATION OF CAL. *CIVIL CODE* SECTION 2923.7)

### (Against all Defendants & DOES 1-100, inclusive)

54.     Plaintiffs re-allege and incorporate by reference herein, each and every allegation in the foregoing and successive paragraphs.

55.     California Civil Code Section 2923.7 requires that large servicers set up and maintain a single point of contact for borrowers seeking foreclosure alternatives, and states in pertinent part:

(a)     Upon request of a borrower who requests a foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact and provide to the borrower one or more direct means of communication with the single point of contact…" (who is) (b) responsible for (1) Communicating the (loan modification) process… (2) Coordinating receipt of all (loan modification) documents, (3) having access to current information and personnel (with knowledge of the current status), (4) ensuring that a borrower is considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any (and) (5) having access to individuals with the ability and authority to stop foreclosure proceedings when necessary." Civ. Code § 2923.7.

56.     WELLS failed to assign a SPOC capable of performing its responsibilities under Cal. Civ. Code §2923.7 (b) (1) though (5).

57.     The SPOCs did not remain assigned to Plaintiffs' account throughout the loan modification application. As a matter of fact, Plaintiffs were forced to deal with several different SPOCs each of whom requested the same documents over and over and could not adequately inform Plaintiff about the current status of his application.

58.     Plaintiffs believe and thereon allege that because the SPOCs requested the same documents over and over again, WELLS did not properly review Plaintiffs' LMA especially since Plaintiffs believe that WELLS did not use accurate NPV information.

13

59.    The SPOCs did not provide accurate NPV information to the Plaintiffs which prevented the Plaintiffs from

60.    Plaintiffs were shuffled from one representative to another every time he called asking for assistance and what he needs to do. Each representative kept asking the same information and the same documents Plaintiff previously submitted with no progress.

61.    Plaintiffs believe and thereon allege that because WELLS representatives asked for the same information and the same documents that were already submitted, this process was unnecessarily delayed by WELLS and caused confusion to the Plaintiffs as to the current status of their LMA.

62.    Upon receiving this conclusory denial, Plaintiffs timely appealed the denial and requested the NPV inputs WELLS used to determine their ineligibility for a loan modification to review the inputs and make sure WELLS used the correct information Plaintiffs provided and the value of the Subject Property WELLS used.

63.    WELLS, in direct and material violation of Civ. Code §2923.6 (f) (3), did not provide Plaintiffs with the NPV inputs. Instead, WELLS sent another vague and non-responsive correspondence to Plaintiffs advising Plaintiffs that upon review of their decision, WELLS determined that Plaintiffs "still do not meet the requirements for a loan modification." **See Exhibit "E"**.

64.    As a result of having to deal with multiple SPOCs who could not accurately and adequately perform their responsibilities under Cal. Civ. Code §2923.7 (b), Plaintiff is informed and believes and thereon alleges that WELLS negligently reviewed them for the loan modification.

65. To date, Plaintiffs have not received the NPV inputs and are informed and believe and thereon allege that WELLS failed to properly review their loan modification application, including their gross income and did not have the correct property value. WELLS' negligent review of the loan modification application and failure to provide the NPV inputs Plaintiffs were entitled to receive is a direct and material violation of HBOR statutes.

66.     As a direct and proximate result of the negligence and carelessness of WELLS, as set forth above, Plaintiffs have suffered damages in an amount not presently ascertained and will be proved at trial and face an imminent non-judicial foreclosure sale of the Subject Property.

## THIRD CAUSE OF ACTION
## (NEGLIGENCE)
### (Against ALL DEFENDANTS and DOES 1 – 100)

67.     Plaintiffs re-allege and incorporate by reference herein, each and every allegation in the foregoing and successive paragraphs.

68.     WELLS, acting as Plaintiff's lender and/or servicer, undertook a review of Plaintiffs' request for loan modification. Having done so, it owes Plaintiff the duty to exercise reasonable care in processing and reviewing their application for a loan modification prior to proceeding with conducting a trustee's sale.

69.     WELLS breached their duty by (1) failing to provide Plaintiff with a good faith review of their loan modification application; (2) failing to assign a SPOC who remained assigned to the account throughout the loan modification process;  (3) failing to assign a competent SPOC capable of performing its responsibilities listed in Cal. Civ. Code §2923.6 (b); (4) failing to provide the NPV inputs upon Plaintiffs' written request;  (5) failing to properly review Plaintiffs' appeal of the denial; (6) failing to contact Plaintiffs prior to recording the NOD as required by Civ. Code §2923.5; (7) failing to rescind the NOD when Plaintiffs paid the amounts in default and became current; and (8) initiating and continuing foreclosure in violation of public policy and statutory restrictions on foreclosures while Plaintiffs are still waiting for the NPV inputs to determine whether WELLS used the correct information.

70.     Since WELLS did not provide a SPOC who could competently conduct their duties pursuant to Cal. Civ. Code 2923.6, WELLS failed to provide a good faith review of the loan modification application even though they

15

provided a complete loan modification none of the SPOCs were aware of current status of Plaintiffs' file, and they kept asking the same information and would inform Plaintiffs that they will review the file and get back to him.

71.     Plaintiffs believe and thereon allege that because the SPOCs were unaware of the current status of Plaintiffs' loan modification application, provided inconsistent information about their application and kept asking the same information from the Plaintiffs, WELLS did not review the loan modification application with accurate NPV calculations.

72.     Due to WELLS not providing the NPV inputs upon Plaintiffs' written request, Plaintiffs were unable to understand why their loan modification application was denied and whether WELLS used the correct calculations in determining whether WELLS conducted the loan modification review in good faith.

73.     Due WELLS negligent conduct, Plaintiffs dispute the total loan amount and believe they have been charged improper and excessive fees and the NPV inputs WELLS used for the determination are inaccurate.

74.     The transaction was intended to affect Plaintiff. It was entirely foreseeable that failing to properly review Plaintiffs' information and to provide the NPV inputs to Plaintiffs will have negative impact on Plaintiffs' qualifications for certain foreclosure prevention alternatives and would also impact the decision on Plaintiffs' application to determine whether Plaintiff could keep their home.

75.     The injury to Plaintiffs is certain. The improper review and processing of Plaintiff's loan modification application and supporting documents, including but not limited to the Plaintiffs' financial records and property value, deprived Plaintiffs of the possibility of obtaining loss mitigation assistance.

76.     There is a close connection between Defendant's conduct and Plaintiffs' injuries. WELLS' conduct in improperly reviewing and processing Plaintiffs' and failure to provide the NPV inputs precluded Plaintiff from obtaining the loan modification to which they were entitled to.

77.     The policy of preventing future harm favors imposing a duty of care on an entity in Defendant's position. In fact, this is evidenced by the fact that the State of California, through legislation, has enacted the Homeowner's Bill of Rights in an effort to prevent future harm from unnecessary and wrongful foreclosure.

78.     As a direct and proximate result of the negligence and carelessness of Defendants and its representatives, Plaintiffs have suffered, and continue to suffer, general and special damages in an amount to be determined at trial and loss of the Subject Property at a non-judicial foreclosure sale.

## FOURTH CAUSE OF ACTION
## (UNFAIR BUSINESS PRACTICES)
## (Against ALL DEFENDANTS and DOES 1 – 100)

79.     Plaintiffs re-allege and incorporate by reference herein, each and every allegation of the foregoing and successive paragraphs.

80.     The Unfair Competition Law defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code §17200, *et seq*.   The Act also provides for injunctive relief and restitution for violations.

81.     By virtue of the acts and omissions of WELLS, WELLS have engaged in unfair and unlawful conduct within the meaning of Cal. Bus. & Prof. Code §17200 when WELLS: (1) recorded the NOD without complying with the pre-NOD outreach under Cal. Civ. Code §2923.5; (2) failed to provide Plaintiffs a good faith review of their loan modification application; (3) failed to assign a SPOC who remained assigned to the account throughout the loan modification process; (4) failed to assign a competent SPOC capable of performing its responsibilities listed in Cal. Civ. Code §2923.6 (b); (5) failed to provide the NPV inputs upon Plaintiffs' written request;  (6) failed to properly review Plaintiffs' appeal of the denial; (7) failed to rescind the NOD when Plaintiffs paid the amounts in default and became current; and (8) initiated and continued the foreclosure in violation of public policy and statutory restrictions on

17

1   foreclosures while Plaintiffs are still waiting for the NPV inputs to determine whether

2   WELLS used the correct information, thereby entitling Plaintiffs to injunctive and

3   restitutionary relief as provided by California Business and Professions Code

4   §17203.

5          82.   The aforementioned acts were willful, oppressive, and malicious, in that

6   WELLS engaged in acts of unfair and unlawful business practice with the deliberate

7   intent to injure Plaintiff. Plaintiff is therefore entitled to payment of damages in a

8   sum sufficient to punish the Defendants and to set an example and deter such conduct

9   in the future.

10         83.   As a direct and foreseeable result of the WELLS' violation of Business

11   and Professions Code §17200, Plaintiff has suffered and will continue to suffer

12   substantial irreparable harm including but not limited to: possible loss of the Subject

13   Property, because WELLS proceeded to initiate a wrongful non-judicial foreclosure

14   on the Subject Property; loss of the opportunity to pursue other foreclosure

15   prevention options; loss of the opportunity to obtain a permanent modification;

16   accrual of the back dues and interest that has accrued to date that would not have

17   accrued but for WELLS' action, excessive fees, the cost and expense of the instant

18   pending litigation, ruined credit ratings, and other actual and consequential damages

19   that will be proven on date of trial.

## FIFTH CAUSE OF ACTION

### (VIOLATION OF CAL. CIV. CODE §2923.5)

### (Against All Defendants & DOES 1-100, inclusive)

22         84.   Plaintiffs re-allege and incorporate by reference herein, each and every

23   allegation contained in the foregoing and successive paragraphs.

24         85.   Cal. Civ. Code §2923.5 (a) (1) prohibits a mortgage servicer, mortgagee,

25   trustee, beneficiary, or authorized agent may not record a notice of default pursuant

26   to Section 2924 until it complies with the requirements of Cal. Civ. Code §2923.5

27   (b) (1) by sending the required information in writing to the borrower.

28

18

86. Cal. Civ. Code § 2923.5 (b) (2) requires that a Notice of Default include a declaration stating that the mortgage, beneficiary or authorized representative contacted the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.

87. A notice of Default may be recorded pursuant to Section 2924 when a mortgage servicer has not contacted a borrower as required provided that the failure to contact the borrower occurred despite the due diligence of the mortgage servicer. Civ. Code §2923.5 (e).

88. To comply with Cal. Civ. Code § 2923.5 (e) due diligence requirement, a mortgage servicer must first send a letter and then attempt to contact the borrower at least three (3) times to the borrower's primary telephone number on file.

89. Despite the self-serving declaration that WELLS contacted Plaintiff as required by Civ. Code §2923.5, Plaintiffs never received any letters, phone calls and had no voicemails from WELLS prior to recordation of the NOD and Plaintiff had the same primary phone number on their file for years.

## PRAYER

WHEREFORE, Plaintiff prays for a judgment against Defendants as follows:

1. For compensatory, special, general and punitive damages according to proof against all Defendants;

2. For an order enjoining the non-judicial foreclosure sale;

3. For damages in excess of $25,000, to be proven at trial, which account for all back due fees, interest, foreclosure fees, legal fees, and penalties, accrued during the foreclosure process;

4. Pursuant to Business and Professions Code Section 17200, that all Defendants, their successors, agents, representatives, employees, and all persons who act in concert with Defendants be permanently enjoined from engaging in any acts of unfair and unlawful business practices in violation of 17200, including, but not limited to, the violations alleged herein;

5. For civil penalties pursuant to statute;

First Amended Complaint

1      6.    For restitution in the amount to be proven at trial;

2      7.    For reasonable attorney's fees according to proof;

3      8.    For fees and costs of suit according to proof;

4      9.    For such other and further relief as the Court deems proper.

5

6    Dated: December 14, 2017          **RA & ASSOCIATES, APC**

7

8                            By: */s/ Manuel Magpanian*

9                            MANUEL MAGPAPIAN, ESQ.

                             ROMEL AMBARCHYAN, ESQ.

10                           Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"



Recording Requested By:

**WELLS FARGO BANK, N.A.**
**1401 WILLOW PASS RD #300**
**CONCORD, CA  94520**

Return To:
**WELLS FARGO BANK, N.A.**
**FINAL DOCUMENTS X6999-01M**
**1000 BLUE GENTIAN ROAD**
**EAGAN, MN  55121-1663**
Prepared By:
**PROCESSING WHOLESALE**
**WELLS FARGO BANK, N.A.**
**1401 WILLOW PASS RD #300**
**CONCORD, CA  94520**

RECORDING REQUESTED BY
CHICAGO TITLE COMPANY





2007108121      03/16/2007 08:30 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:          82.00

25  PGS



—————————[Space Above This Line For Recording Data]—————————

## DEED OF TRUST                          0158733626

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **MARCH 7, 2007**
together with all Riders to this document.
**(B) "Borrower"** is
**RICHARD A. JACOBIK AND CHRISTINE S. JACOBIK, HUSBAND AND WIFE**

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  **WELLS FARGO BANK, N.A.**

Lender is a  **National Association**
organized and existing under the laws of  **THE UNITED STATES OF AMERICA**

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     FORM 3005   1/01

Page 1 of 18         Initials:                                        SCA01   Rev 11/09/00

Lender's address is
P. O. BOX 5137, DES MOINES, IA 50306-5137
Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is FIDELITY NATIONAL TITLE INSURANCE COMPANY

(E) "Note " means the promissory note signed by Borrower and dated MARCH 7, 2007
The Note states that Borrower owes Lender SIX HUNDRED THIRTY-ONE THOUSAND
TWO HUNDRED AND NO/100                                                    Dollars
(U.S. $ ......631,200.00............) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than   APRIL 1, 2037
(F) "Property" means the property that is described below under the heading "Transfer of
Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges
and late charges due under the Note, and all sums due under this Security Instrument, plus
interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower.
The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an
electronic terminal, telephonic instrument, computer, or magnetic tape so as to order,
instruct, or authorize a financial institution to debit or credit an account. Such term includes,
but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers
initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation
or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or
(iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et
seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be
amended from time to time, or any additional or successor legislation or regulation that

SCA02   Rev 12/18/00                Page 2 of 18        Initials: _____        FORM 3005   1/01

governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | ALAMEDA | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.**

*See Attached Exhibit "A"*

**THIS IS A PURCHASE MONEY MORTGAGE.**

Parcel ID Number: 986-0025-023-02          which currently has the address of
4066 INNISWOOD PLACE                                                                          [Street]
DUBLIN                                  [City] , California      94568      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

SCA03   Rev 11/09/00          Page 3 of 16          Initials:          FORM 3005   1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In

SCA07     Rev 11/09/00                    Page 7 of 18          Initials:                    FORM 3005     1/01

either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

   **6. Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

   **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

   Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

   **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

   **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or

SCA06    Rev 09/22/00                    Page 8 of 18          Initials:           FORM 3005    1/01

(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

SCA09   Rev 11/13/00                    Page 9 of 16          Initials:_____          FORM 3005   1/01

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage Insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premium that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

SCA10   Rev 09/22/00              Page 10 of 18         Initials           FORM 3005   1/01

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly

requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

SCA13   Rev 11/09/00                    Page 13 of 18          Initials:                    FORM 3005   1/01

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

SCA14    Rev  12/27/00              Page 14 of 16        Initials:              FORM 3005    1/01

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

   **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

   Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

   Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

   NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

   **22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or**

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

SCA16   Rev 09/22/00                Page 16 of 16          Initials:          FORM 3005   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _Richard C Jacobik_____ (Seal)   3.3.07
                                            RICHARD A. JACOBIK            Borrower

_____          _Christine Jacobik_____ (Seal)
                                            CHRISTINE S. JACOBIK          Borrower

SCA17   Rev 12/27/00                Page 17 of 18          Initials: _____          FORM 3005   1/01

State of California,                                                    ss:

County of   ALAMEDA

On   080807     before me, Brian K Gillman , NOTARY
                                                    personally appeared
**RICHARD A. JACOBIK AND CHRISTINE S. JACOBIK, HUSBAND AND WIFE**

**Non-Borrower: CHRISTINE S. JACOBIK**

, ~~personally known to me.~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

BRIAN K. GILLMAN
Commission # 1688271
Notary Public - California
Alameda County
My Comm. Expires Sep 15, 2010

Brian K. Gillman
1688271
Alameda
Sept 15-2010

SCA16    Rev 10/17/00              Page 16 of 16        Initials:              FORM 3005    1/01

Escrow No.: 07-38303607-MI
Locate No.: CACTI7701-7707-2383-0059011409
Title No.: 07-59011409-MK

# EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF DUBLIN, COUNTY OF ALAMEDA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

**Parcel One:**

Being a portion of Lot 62, as said Lot is shown on Tract 7075, filed on April 18, 2001, in Map Book 257, Pages 47-61, as amended by Certificate of Correction, recorded April 18, 2002, Series No. 2002-171552, Official Records of Alameda County, State of California, for purposes of a Lot Line Adjustment, being in the City of Dublin, Alameda County, California, and being more particularly described as follows:

Beginning at the most southwesterly corner of said Lot 62; thence along the westerly line of said Lot 62, N 03° 24' 16" E, 37.00 feet to the northerly line of said Lot 62; thence along said northerly line, S 86° 35' 44" E, 45.00 feet; thence N 03° 24' 16" E, 8.00 feet; thence S 86° 35' 44" E, 17.08 feet; thence N 03° 24' 16" E, 31.00 feet to the northerly line of said Lot 62; thence along said northerly line, S 86° 35' 44" E, 13.92 feet; thence leaving said northerly line, S 03° 24' 16" W, 42.17 feet; thence S 86° 35' 44" E, 2.00 feet to the easterly line of said Lot 62; thence along said easterly line, S 03° 24' 16" W, 33.83 feet to the southerly line of said Lot 62; thence along said southerly line, N 86° 35' 44" W, 78.00 feet to the point of beginning.

Reserving therefrom, a non-exclusive easement for private storm drain purposes, shown as a "P.S.D.E." on said Map of Tract 7075, for the benefit of the Lot Owners in Tract 7075.

Reserving therefrom, an easement appurtenant to Lot 63, shown contiguous to Lot 63 as "3'REA" (Reciprocal Easement Area) on said Map of Tract 7075, for installation and maintenance of private landscape facilities and recreational use of Yard Area.

Further reserving therefrom, an easement appurtenant to Lot 61, shown as "7' PDE" (Private Driveway Easement) on said Map of Tract 7075, for Private Vehicle and Pedestrian Access Ways.

**Parcel Two:**

An easement, appurtenant to Parcel One, hereinabove, for installation and maintenance of Private Landscape Facilities and recreational use of Yard Area, over that portion of Lot 61 shown as "3'REA" (Reciprocal Easement Area) on said Tract Map 7075.

**Parcel Three:**

An easement, appurtenant to Parcel One, hereinabove, for private vehicle and pedestrian access ways, over that portion of Lot 61 shown as "7' PDE" (Private Driveway Easement) on said Tract Map 7075.

**Parcel Four:**

A non-exclusive easement for ingress and egress, use and enjoyment, appurtenant to Parcel One, hereinabove, over, under, along and through the "Common Area" as defined in the Riva at Tassajara Declaration of Restrictions, recorded December 28, 2001, Series No. 2001505672, Official Records, and any amendments and/or annexations thereto.

APN: 986-0025-023-02

# PLANNED UNIT DEVELOPMENT RIDER

0156733626

THIS PLANNED UNIT DEVELOPMENT RIDER is made this .7th day of MARCH, 2007................,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust
or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the
"Borrower") to secure Borrower's Note to ..........................................................................
WELLS FARGO BANK, N.A.

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at: .............. 4086 INNISWOOD PLACE ..........................................................
DUBLIN, CA  94568
*(Property Address)*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with
other   such   parcels   and   certain   common   areas   and   facilities,   as   described   in
.................................................................................................................................

(the   "Declaration").   The   Property   is   a   part   of   a   planned   unit   development   known   as
....................... TASSAJARA CREEK MAINTENANCE ASSOC ...............................................
*(Name of Planned Unit Development)*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners
Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners Association; and
(iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly
pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER                                          Form 3150 1/01   (Page 1 of 3)
Single Family - FNMA/FHLMC Uniform Instrument                EC026L Rev. 11/13/00

0158733626

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender required insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 2 of 3)
EC025L Rev. 11/13/00

0168733626

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)   3.8.07
RICHARD A. JACOBIK                -Borrower

_____ (Seal)   3.8.07
CHRISTINE S. JACOBIK              -Borrower

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 3 of 3)
EC025L Rev. 11/13/00

# PLANNED UNIT DEVELOPMENT RIDER

0156733626

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 7th day of MARCH, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust
or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the
"Borrower") to secure Borrower's Note to
WELLS FARGO BANK, N.A.

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at: 4086 INNISWOOD PLACE
DUBLIN, CA 94568
*(Property Address)*

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with
other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as
RIVA HOA
*(Name of Planned Unit Development)*

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners
Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners Association; and
(iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly
pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 1 of 3)
EC025L Rev. 11/13/00

**0158733626**

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender required insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 2 of 3)
EC025L Rev. 11/13/00

0158733626

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)     38.07
RICHARD A. JACOBIK          -Borrower

_____ (Seal)     3.8.07
CHRISTINE S. JACOBIK        -Borrower

MULTISTATE PUD RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3150 1/01   (Page 3 of 3)
EC025L Rev. 11/13/00

# EXHIBIT "B"

RECORDING REQUESTED BY:
**TICOR TITLE COMPANY OF CALIFORNIA**
**18302 IRVINE BLVD, STE 100, TUSTIN, CA 92780**

WHEN RECORDED MAIL TO:
**NBS Default Services, LLC**
301 E. Ocean Blvd. Suite 1720
Long Beach, CA 90802



2012193726   06/14/2012 11:25 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:   24.00

3 PGS

3
M

SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN: 986-0025-023-02      TS No.: 9980-8199      **TSG ORDER No.: 88284**

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST
## IMPORTANT NOTICE

### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,
and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$23,003.83** as of 06/12/2012, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and Deed of Trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and Deed of Trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**Wells Fargo Bank, N. A.**
**c/o NBS Default Services, LLC**
**301 E. Ocean Blvd. Suite 1720**
**Long Beach, CA 90802**
**Attn: Foreclosure Dept.**
**800-766-7751**

see Attached Declaration

TS.No.: 9980-8199

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That NBS Default Services, LLC is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 03/07/2007, executed by   RICHARD A. JACOBIK AND CHRISTINE S. JACOBIK, HUSBAND AND WIFE, as Trustor(s), to secure certain obligations in favor of WELLS FARGO BANK, N.A., as beneficiary, recorded on 03/16/2007 as Document No.: 2007108121,  of Official Records in the Office of the Recorder of Alameda County, California describing land therein as: As more fully described on said Deed of Trust.

Included among these obligations is one Note(s) for the original sum of $631,200.00 that that beneficial interest under such Deed of Trust and the obligations secured thereby presently held by the beneficiary or its agent; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of:
**Installment of Principal and Interest which became due on 02/01/2012, plus impounds and/or advances together with late charges, and all subsequent installments of principal, interest, plus impounds and/or advances and late charges and any reoccurring obligation that become due, including trustee's fees and expenses.**

That by reason therefore, the present beneficiary under such Deed of Trust has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

NOTHING IN THIS NOTICE SHALL BE CONSTRUED AS WAIVER OF ANY OTHER FEES OWING TO THE BENEFICIARY, OR OTHER DEFAULT BY THE TRUSTOR, PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.

The beneficiary declares that it has complied with California Civil Code Section 2923.5. The Declaration pursuant to California Civil Code, Section 2923.5(b) is attached hereto as Exhibit "A"

Dated: June 12, 2012

NBS Default Services, LLC, as Trustee or Agent for the Beneficiary

BY: _____
    Lauren Compise

"We are attempting to collect a debt, and any information we obtain will be used for that purpose."

## NOTICE OF DEFAULT DECLARATION
PURSUANT TO CALIFORNIA CIVIL CODE 2923.5

Wells Fargo Bank, N.A.
3476 Stateview Blvd.
Fort Mill, SC 29715

Borrower:   RICHARD A JACOBIK
Co Borrower:
Property Address:  4086 INNISWOOD PLACE
                   DUBLIN  CA  94568

The undersigned mortgagee, beneficiary, or their authorized agent (collectively, the "Beneficiary") represent and declares that the requirements of CA Civil Code 2923.5 have been met. This Declaration is required for any residential owner occupied property in which the loan was originated between January 1, 2003 and December 31, 2007. Non-owner occupied and vacant properties are exempt from the requirements of CA Civil Code 2923.5.

The requirement indicated by "X" was met by the Beneficiary:

___   The Beneficiary has made contact with the borrower pursuant to CA Civil Code 2923(a)(2). Contact with the borrower was made in person or by telephone to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.

X   Due Diligence to contact the borrower was exercised pursuant to CA Civil Code 2923.5(g)(2) by the Beneficiary.

___   The borrower has surrendered the property as evidenced by either a letter confirming the surrender or delivery of the keys to the property to the mortgagee, Trustee, beneficiary, or authorized agent pursuant to CA Civil Code 2923.5(h)(1).

___   The borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and avoid their contractual obligations to mortgagees or beneficiaries pursuant to CA Civil Code 2923.5(h)(2).

___   The borrower has filed for bankruptcy and the proceedings have not been finalized pursuant to CA Civil Code 2923.5(h)(3).

___   An Exemption as identified in 2923.5 (h) & (i) applies: The loan did not originate between January 1, 2003 and December 31, 2007 or the property is deemed Non-owner occupied or vacant.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:

Wells Fargo Bank, N.A.
Steven Conley
VP of Loan Documentation

# EXHIBIT "C"

RECORDING REQUESTED BY
TICOR TITLE COMPANY OF CALIFORNIA
4210 Riverwalk Parkway, Suite 200
Riverside, CA 92505

AND WHEN RECORDED MAIL TO:
NBS Default Services, LLC
301 E. Ocean Blvd. Suite 1720
Long Beach, CA 90802



2016256320    10/04/2016 12:19 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
STEVE MANNING
RECORDING FEE:    31.00



3    PGS

SPACE ABOVE THIS LINE FOR RECORDER'S USE

T.S. No.: 9980-8199    TSG Order No.: 88284    A.P.N.: 986-0025-023-02

## NOTICE OF TRUSTEE'S SALE
NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED

出售通知

注：本文件包含一个信息摘要

매각 공고
참고사항: 본 첨부 문서에 정보 요약서가 있습니다

## AVISO DE VENTA
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACION DE ESTE DOCUMENTO

## PABATID NG PAGBEBENTA
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP

THÔNG BÁO BÁN
BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN CHÍNH

(The above statement is made pursuant to CA Civil Code Section 2923.3(c)(1). The Summary will be provided to Trustor(s) and/or vested owner(s) only, pursuant to CA Civil Code Section 2923.3(c)(2).)

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 03/07/2007.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

NBS Default Services, LLC, as the duly appointed Trustee, under and pursuant to the power of sale contained in that certain Deed of Trust Recorded 03/16/2007 as Document No.: 2007108121, of Official Records in the office of the Recorder of Alameda County, California, executed by: RICHARD A. JACOBIK AND CHRISTINE S. JACOBIK, HUSBAND AND WIFE, as Trustor, WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH (payable in full at time of sale by cash, a cashier's check drawn by a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state).   All right, title and interest conveyed to and now held by it under said Deed of Trust in the property situated in said County and state, and **as more fully described in the attached legal description.**

Sale Date & Time: 10/25/2016 at 12:00 PM
Sale Location: At the Fallon Street emergency exit to the Alameda County Courthouse, 1225 Fallon St., Oakland, CA

The street address and other common designation, if any, of the real property described above is purported to be: 4086 INNISWOOD PLACE, DUBLIN, CA 94568

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.  Said sale will be made in an "AS IS" condition, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by said Deed of Trust, with interest thereon, as provided in said note(s), advances, if any, under the terms of the Deed of Trust, estimated fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to-wit: $766,919.99 (Estimated) as of 09/14/2016.   Accrued interest and additional advances, if any, will increase this figure prior to sale.  It is possible that at the time of sale the opening bid may be less than the total indebtedness due.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call, 916-939-0772 for information regarding the trustee's sale or visit this Internet Web site, www.nationwideposting.com, for information regarding the sale of this property, using the file number assigned to this case, T.S.# 9980-8199. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the internet Web site. The best way to verify postponement information is to attend the scheduled sale.

*If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee and the successful bidder shall have no further recourse.*

NBS Default Services, LLC
301 E. Ocean Blvd. Suite 1720
Long Beach, CA 90802
800-766-7751
For Trustee Sale Information Log On To: www.nationwideposting.com or Call: 916-939-0772.

_____
NBS Default Services, LLC, Kim Coker, Foreclosure Associate

This communication is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you have received a discharge of the debt referenced herein in a bankruptcy proceeding, this is not an attempt to impose personal liability upon you for payment of that debt. In the event you have received a bankruptcy discharge, any action to enforce the debt will be taken against the property only.

LEGAL DESCRIPTION

PARCEL ONE:
BEING A PORTION OF LOT 62, AS SAID LOT IS SHOWN ON TRACT 7075, FILED ON APRIL 18, 2001, IN MAP BOOK 257, PAGES 47-61, AS AMENDED BY CERTIFICATE OF CORRECTION, RECORDED APRIL 18, 2002, SERIES NO. 2002-171552, OFFICIAL RECORDS OF ALAMEDA COUNTY, STATE OF CALIFORNIA, FOR PURPOSES OF A LOT LINE ADJUSTMENT, BEING IN THE CITY OF DUBLIN, ALAMEDA COUNTY, CALIFORNIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
BEGINNING AT THE MOST SOUTHWESTERLY CORNER OF SAID LOT 62; THENCE ALONG THE WESTERLY LINE OF SAID LOT 62, N 03° 24` 16" E, 37.00 FEET TO THE NORTHERLY LINE OF SAID LOT 62; THENCE ALONG SAID NORTHERLY LINE, S 86° 35` 44" E, 45.00 FEET; THENCE N 03° 24` 16" E, 8.00 FEET; THENCE S 86° 35` 44" E, 17.08 FEET; THENCE N 03° 24` 16" E, 31.00 FEET TO THE NORTHERLY LINE OF SAID LOT 62; THENCE ALONG SAID NORTHERLY LINE, S 86° 35` 44" E, 13.92 FEET; THENCE LEAVING SAID NORTHERLY LINE, S 03° 24` 16" W, 42.17 FEET; THENCE S 86° 35` 44" E, 2.00 FEET TO THE EASTERLY LINE OF SAID LOT 62; THENCE ALONG SAID EASTERLY LINE, S 03° 24` 16" W, 33.83 FEET TO THE SOUTHERLY LINE OF SAID LOT 62; THENCE ALONG SAID SOUTHERLY LINE, N 86° 35` 44" W, 78.00 FEET TO THE POINT OF BEGINNING.
RESERVING THEREFROM, A NON-EXCLUSIVE EASEMENT FOR PRIVATE STORM DRAIN PURPOSES, SHOWN AS A "P.S.D.E." ON SAID MAP OF TRACT 7075, FOR THE BENEFIT OF THE LOT OWNERS IN TRACT 7075.
RESERVING THEREFROM, AN EASEMENT APPURTENANT TO LOT 63, SHOWN CONTIGUOUS TO LOT 63 AS "3`REA" (RECIPROCAL EASEMENT AREA) ON SAID MAP OF TRACT 7075, FOR INSTALLATION AND MAINTENANCE OF PRIVATE LANDSCAPE FACILITIES AND RECREATIONAL USE OF YARD AREA.
FURTHER RESERVING THEREFROM, AN EASEMENT APPURTENANT TO LOT 61, SHOWN AS "7 PDE" (PRIVATE DRIVEWAY EASEMENT) ON SAID MAP OF TRACT 7075, FOR PRIVATE VEHICLE AND PEDESTRIAN ACCESS WAYS.
PARCEL TWO:
AN EASEMENT, APPURTENANT TO PARCEL ONE, HEREINABOVE, FOR INSTALLATION AND MAINTENANCE OF PRIVATE LANDSCAPE FACILITIES AND RECREATIONAL USE OF YARD AREA, OVER THAT PORTION OF LOT 61 SHOWN AS "3`REA" (RECIPROCAL EASEMENT AREA) ON SAID TRACT MAP 7075.
PARCEL THREE:
AN EASEMENT, APPURTENANT TO PARCEL ONE, HEREINABOVE, FOR PRIVATE VEHICLE AND PEDESTRIAN ACCESS WAYS, OVER THAT PORTION OF LOT 61 SHOWN AS "7` PDE" (PRIVATE DRIVEWAY EASEMENT) ON SAID TRACT MAP 7075.
PARCEL FOUR:
A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS, USE AND ENJOYMENT, APPURTENANT TO PARCEL ONE, HEREINABOVE, OVER, UNDER, ALONG AND THROUGH THE "COMMON AREA" AS DEFINED IN THE RIVA AT TASSAJARA DECLARATION OF RESTRICTIONS, RECORDED DECEMBER 28, 2001,SERIES NO. 2001505672, OFFICIAL RECORDS, AND ANY AMENDMENTS AND/OR ANNEXATIONS THERETO.

# EXHIBIT "D"

Wells Fargo Home Mortgage
Return Mail Operations
PO Box 10368
Des Moines, IA 50306-0368

Page 1 of 5



March 15, 2017

| Account Information | |
| --- | --- |
| Fax: | 1-866-590-8910 |
| Telephone: | 1-800-416-1472 |
| Correspondence: | PO Box 10335 |
| | Des Moines, IA 50306 |
| Hours of operation: | Mon - Thurs, 7 a.m. - 9 p.m., |
| | Fri, 7 a.m. - 8 p.m., |
| | Sat, 8 a.m. - 4 p.m., CT |
| Loan number: | 0158733626 |
| Property address: | 4086 INNISWOOD PLACE |
| | DUBLIN CA 94568 |

085

MATTHEW M. SPIELBERG
LAW OFFICE OF MATTHEW M. SPIEL
21855 REDWOOD RD.
CASTRO VALLEY, CA 94546

Subject:   Action required regarding your client's Home Preservation review
Mortgagor(s): RICHARD JACOBIK
Loan number: 0158733626

Dear Matthew M. Spielberg:

I have enclosed a copy of correspondence that must be passed along to your client which provides time sensitive information about a Home Preservation review on their property.

**Next steps required**
Please review the attached documents with next steps including any documentation needed to continue the review and ensure that you or your client responds within the given timeframes.

**I'm here to help**
As your client's home preservation specialist, I'm standing by to help with your client's needs. If you have any questions about the information in this letter, you can reach me at the phone number listed below.

Sincerely,

Tigre Leichliter

Tigre Leichliter
Home Preservation Specialist
Wells Fargo Home Mortgage
Ph: 1-8557160537 ext. 5154142158
Fax: 1-866-590-8910

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. © 2016 Wells Fargo Bank, N.A. All rights reserved. NMLSR ID 399801

HP601 706

Wells Fargo Home Mortgage
Return Mail Operations
PO Box 10368
Des Moines, IA 50306-0368

Page 2 of 5



March 15, 2017

| Account Information | |
|---|---|
| **Fax:** | 1-866-590-8910 |
| **Telephone:** | 1-800-416-1472 |
| **Correspondence:** | PO Box 10335 |
| | Des Moines, IA 50306 |
| **Hours of operation:** | Mon - Thurs, 7 a.m. - 9 p.m., |
| | Fri, 7 a.m. - 8 p.m., |
| | Sat, 8 a.m. - 4 p.m., CT |
| **Loan number:** | 0158733626 |
| **Property address:** | 4086 INNISWOOD PLACE |
| | DUBLIN CA 94568 |

085

RICHARD JACOBIK
4086 INNISWOOD PLACE
DUBLIN, CA 94568

PLEASE NOTE: This notice is being provided for informational purposes only. As a result of at least one bankruptcy case filing that included the above referenced account, Wells Fargo Home Mortgage is NOT attempting in any way to violate any provision of the United States Bankruptcy Code or to collect a debt (deficiency or otherwise) from any customer(s) who is impacted by an active bankruptcy case or has received a discharge, where the account was not otherwise reaffirmed or excepted from discharge. THIS IS NOT A BILL OR A REQUEST FOR PAYMENT AS TO THESE CUSTOMER(S). Your decision to discuss workout options with Wells Fargo Home Mortgage is strictly voluntary. You are not obligated to pursue any workout options discussed with us. At your request, we will immediately terminate any such discussions should you no longer wish to pursue these options.

Subject: Your request for assistance

Note: We service your mortgage on behalf of your investor, HSBC BANK USA, N.A. as trustee for WFMBS 2007-7.

Dear RICHARD JACOBIK:

We're responding to your request for assistance and the options that may be available to help you. We realize that the process can take some time, and we appreciate your patience while we review your options.

**Here's what we found**
We carefully reviewed the information you provided us, which included a process that compared your information to the qualifications for assistance associated with your loan.  Here is the result of that review.

Program name: Piggy-Back or Piggy-back w/ Temporary Rate Reduction
Program description: Past due payments are set aside but carried for the life of the loan as a zero interest, zero payment balance. This set aside balance is due upon payoff of the loan or at maturity, whichever occurs first.

HP601 708

Page 3 of 5

| Account Information | |
| --- | --- |
| Loan number: | 0158733626 |
| Property address: | 4086 INNISWOOD PLACE DUBLIN CA 94568 |

A temporary rate modification may also be a part of this plan, reducing the interest rate to provide an affordable payment. At the end of the rate-reduction period, the interest rate gradually increases until the original interest rate is back in effect for the life of the loan.

At this time, you do not meet the requirements of this program because:

We are unable to modify your mortgage based on the results of your net present value (NPV) evaluation.

Once we determined that you did not meet the requirements for a particular program, we did not continue to evaluate that program based on other criteria related to your loan type or information you may have supplied. Instead we moved to evaluate you for the next available program based on your information and the qualifications associated with your loan.

For California homeowners, additional NPV information is available
If the loan referenced above is a first lien on a property located in the state of California, and you occupy the property as your primary residence you can receive a complete list of the NPV information we used in your evaluation. Contact us in writing with your request.
Please fax your request to 1-866-359-7363 or mail to:
Wells Fargo Home Mortgage
1000 Blue Gentian Road,
Suite 300 MAC X9999-01N,
Eagan, MN 55121

If you believe our decision on your eligibility for assistance is incorrect, you can appeal within 36 calendar days from the date of this letter. You can follow the instructions outlined in the enclosed Appeal Request Form.

**Talk to me about your other options**
We have options available to help you avoid a foreclosure. You are eligible for a short sale and deed in lieu of foreclosure provided you meet the requirements.

If the amount you owe on your mortgage is higher than what you think you can sell your house for, you may want to consider what is known as a "short sale." This option could allow you to list your home for sale, for an amount that is less than you owe.

During the short sale process, you'll need to submit documentation to us that we will evaluate. For example, a short sale requires a purchase contract. Once we receive a purchase contract Wells Fargo Home Mortgage will review the terms of the contract and obtain the appraised value of the property.

If you are interested in a short sale, contact me right away. I can help explain the short sale process, guidelines and your eligibility.

If you are unable to sell your home or find a short sale is not the right alternative to foreclosure for you, another option to consider might be a deed in lieu of foreclosure, sometimes referred to as a Mortgage

HP601 708

| Account Information | |
|---|---|
| Loan number: | 0158733626 |
| Property address: | 4086 INNISWOOD PLACE DUBLIN CA 94568 |

Release. If you are interested in a deed in lieu of foreclosure, please contact me right away so we can determine your eligibility and coordinate an appraisal and inspection of your property.

Keep in mind, if you accept a deed in lieu of foreclosure, you must agree to vacate the property within an agreed upon time.

**We're here for you**
If you have any questions about the information in this letter please call me at the phone number listed below.

Sincerely,

## Tigre Leichliter

Tigre Leichliter
Home Preservation Specialist
Wells Fargo Home Mortgage
Ph: 1-8557160537 ext. 5154142158
Fax: 1-866-590-8910

**Contact us**
If you'd like to request information, notify us of an error, or share any concerns you may have about the servicing of your loan, please contact us at P.O. Box 10335, Des Moines, IA 50306. Please include your account number with all correspondence.

Get free counseling to help manage expenses and avoid foreclosure. Reach out to a local HUD-approved, non-profit housing counseling agency if you're struggling to keep up with monthly expenses, or want help to avoid foreclosure. At no cost, a counselor will work closely with you, providing the information and assistance you need. To find an agency near you, go to www.hud.gov/offices/hsg/sfh/hcc/fc. Or call 1-800-569-4287 (TDD 1-800-877-8339). You can also call HOPE Hotline at 1-888-995-HOPE (4673).

Be sure you avoid anyone who asks for a fee for counseling or a loan modification, or asks you to sign over the deed to your home, or to make your mortgage payments to anyone other than Wells Fargo Home Mortgage.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is Bureau of Consumer Financial Protection, 1700 G Street NW., Washington, DC 20006.

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. © 2016 Wells Fargo Bank, N.A. All rights reserved. NMLSR ID 399801

HP601 708

# Appeal request form

March 15, 2017

**What you need to do**
If you believe our decision on your eligibility for assistance is incorrect, you can appeal within 36 calendar days from the date of this letter.

You can request an appeal by fax, mail, or phone:

| By fax | By mail | By phone |
| --- | --- | --- |
| Fax number:<br>1-866-590-8910 | Return address:<br>Wells Fargo Home Mortgage<br>MAC X9999-01N<br>1000 Blue Gentian Road,<br>Suite 300<br>Eagan, MN 55121 | Toll-free number:<br>1-877-816-4914<br>and follow the prompts<br><br>Be sure to have your loan number. |

If you choose to submit your appeal request in writing (via fax or mail), you can either use this appeal request form or write a letter of your own that explains the reason you believe our decision is incorrect. Include any additional information or documents that may help us review your appeal. Be sure to write your loan number on all documents. We'll review your appeal request based on the information you have provided (if applicable), or on the information we already have. After we receive your appeal request, you'll receive a confirmation letter with next steps.

1. Please state which decisions you believe are incorrect and why:

    _____

    _____

    _____

2. Please enclose any additional information you may have that supports your appeal.

3. If you are disputing the property value used in our decision, please state the value you believe to be correct:

    $_____

4. Provide your contact information:

    Primary contact phone:_____

    Other contact numbers:_____

    Best days and times to reach you:_____

5. Fax or mail your appeal request to us as indicated at the top of the form.

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. © 2016 Wells Fargo Bank, N.A. All rights reserved. NMLSR ID 399801

HP601 708

# EXHIBIT "E"

Wells Fargo Home Mortgage
Return Mail Operations
PO Box 10368
Des Moines, IA 50306-0368



April 20, 2017

DCML1TD1AU  007256
lllₒll||ll|ₚl|ₚₘₒₒll||ₒₚ|l|lₒ|l|lₒₒₚₒllₒll|ₒl|ₒₒll|||ll|ₒl₀

RICHARD A JACOBIK
4086 INNISWOOD PLACE
DUBLIN, CA 94568

**Account Information**

| | |
|---|---|
| Online: | wellsfargo.com |
| Fax: | 1-866-359-7363 |
| Telephone: | 1-800-416-1472 |
| Correspondence: | PO Box 10335 |
| | Des Moines, IA 50306 |
| Hours of operation: | Mon - Fri , 8 a.m - 5 p.m , CT |

| | |
|---|---|
| Loan number: | 0158733626 |
| Property address: | 4086 Inniswood Place |
| | Dublin CA 94568 |

**PLEASE NOTE:** This notice is being provided for informational purposes only. As a result of at least one bankruptcy case filing that included the above referenced account, Wells Fargo Home Mortgage is NOT attempting in any way to violate any provision of the United States Bankruptcy Code or to collect a debt (deficiency or otherwise) from any customer(s) who is impacted by an active bankruptcy case or has received a discharge, where the account was not otherwise reaffirmed or excepted from discharge. THIS IS NOT A BILL OR A REQUEST FOR PAYMENT AS TO THESE CUSTOMER(S).
Your decision to discuss workout options with Wells Fargo Home Mortgage is strictly voluntary. You are not obligated to pursue any workout options discussed with us. At your request, we will immediately terminate any such discussions should you no longer wish to pursue these options.

Subject: Decision on your loan modification and next steps

Dear Richard A Jacobik:

In response to your appeal request, we have completed a review of the decision we made about your mortgage.

**Here's what we found**
After carefully reviewing the information we currently have, we have determined that you still do not meet the requirements for a loan modification.

**Talk to me about your other options**
We have options available to help you avoid a foreclosure. You are eligible for a short sale and deed in lieu of foreclosure provided you meet the requirements.

If the amount you owe on your mortgage is higher than what you think you can sell your house for, you may want to consider what is known as a "short sale". This option could allow you to list your home for sale, for an amount that is less than you owe.

During the short sale process, you'll need to submit documentation to us that we will evaluate. For example, a short sale requires a purchase contract. Once we receive a purchase contract Wells Fargo Home Mortgage will review the terms of the contract and obtain the appraised value of the property.

BK609 706 0395

**Scanned by CamScanner**

Case 3:17-cv-05121-LB   Document 31   Filed 12/14/17   Page 63 of 65

## VERIFICATION

1       I, the undersigned certify and declare that I have read the   First Amended

2

3  Complaint and know its contents.

4

5       I am a party to this action. The matters stated in the document described

6

7  above are true of my own knowledge and belief except as to those matters stated on

8  information and belief, and as to those matters I believe them to be true.

9       Executed on December 14, 2017 at County of Alameda, California.

10

11       I declare under penalty of perjury under the laws of the State of California

12  that the foregoing is true and correct.

13

14

15

16

17                     RICHARD JACOBIK

18                  12-14-2017

19

20

21

22

23

24

25

26

27

28

21.

Verified First Amended Complaint-Jacobik

Scanned by CamScanner

1

## VERIFICATION

2

3       I, the undersigned certify and declare that I have read the   First Amended

4   Complaint and know its contents.

5       I am a party to this action. The matters stated in the document described

6

7   above are true of my own knowledge and belief except as to those matters stated on

8   information and belief, and as to those matters I believe them to be true.

9       Executed on December 14, 2017 at County of Alameda, California.

10

11       I declare under penalty of perjury under the laws of the State of California

12   that the foregoing is true and correct.

13

14

15

16

17                          CHRISTINE JACOBIK

18                          12-14-2017

19

20

21

22

23

24

25

26

27

28

22.

Verified First Amended Complaint-Jacobik

Scanned by CamScanner

1

## <u>CERTIFICATE OF SERVICE</u>

2

3    I, the undersigned, declare that I am over the age of 18 and am not a party to

this action. I am employed in the County of Los Angeles, State of California. My

4    business address is 505 N. Brand Blvd., Suite 800, Glendale, California 91203.

5    On January 25, 2018, I served a copy of the foregoing document entitled:

6    **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
     FIRST AMENDED COMPLAINT**

7    On the interested parties in said case as follows:

8

### Served Electronically via the Court's CM/ECF System:

9

*Attorney for Defendant, Wells Fargo Bank, N.A.*

10

Tara Mohseni, Esq.

11              Severson & Werson

12          One Embarcadero Center, Ste. 2600

San Francisco, CA 94111

13    Tel.: (415) 398-3344 | Fax: (415) 965-0430

14              Email: TM@severson.com

15

16

17    I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct. I declare that I am employed in the

18    office of a member of the Bar of this Court, at whose direction the service was

19    made. This declaration is executed in Glendale, California on January 25, 2018.

20

21    <u>Julia Sheveleva</u>                    */s/ Julia Sheveleva*

(Type or Print Name)                    (Signature of Declarant)

22

23

24

25

26

27

28